[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-16656

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 11, 2010
JOHN LEY
ACTING CLERK

D.C. Docket No. 07-00815-CV-5-IPJ

JOHN HARRISON,

Plaintiff-Appellant,

versus

BENCHMARK ELECTRONICS HUNTSVILLE, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(January 11, 2010)

Before DUBINA, Chief Judge, BIRCH and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

**INTRODUCTION**

John Harrison sued Benchmark Electronics Huntsville, Inc. ("BEHI"), alleging, <u>inter alia</u>, that BEHI engaged in an improper medical inquiry, in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12112(d)(2). The district court granted summary judgment in favor BEHI on all claims. We reverse.

**I.**

**A.**

In November 2005, Aerotek, a company that places temporary workers at BEHI, assigned Harrison to work at BEHI. Harrison worked as a "debug tech," and his responsibilities included identifying problems with, repairing, and testing electronic boards. Although he suffers from epilepsy and takes barbiturates to control his condition, the Equal Employment Opportunity Commission ("EEOC") determined that he did not have a disability as defined under the ADA.

At the time Harrison commenced his temporary position at BEHI, the company had a practice of screening temporary employees for potential permanent employment. If a supervisor believed that a temporary employee would meet BEHI's needs, he would invite that employee to submit an application for employment and complete the necessary drug testing and background check.

2

Usually, after a candidate had cleared both a background and drug test,[1] human resources would extend him an offer, unless the hiring manager instructed otherwise.

On May 19, 2006, Harrison submitted an application for permanent employment, at the request of his supervisor, Don Anthony. Along with his application, he consented to a drug test. In July 2006, Anthony called Faye Robinson, the director of BEHI's human services department, to get the requisitions for three permanent positions, including the position for which Harrison had applied. He identified Harrison as the only person he was interested in employing. After corporate had approved his requisitions, Anthony told Harrison to take the drug test, and he complied. Harrison was at no time informed that his performance was deficient or that he had an attitude problem.

In July 2006, Lena Williams, employed in BEHI's human resources department, was notified that Harrison's test had come back positive and was awaiting review by a Medical Review Officer ("MRO"). She called Anthony and asked him to "send [Harrison] her way." She stated that she did not tell Anthony about the positive drug screen at any time, because she had a duty to keep such

---

[1] Although Harrison was technically a contract employee of Aerotek, both parties have treated the drug test, administered in conjunction with his application for permanent employment with BEHI, as a pre-employment inquiry subject to 42 U.S.C. § 12112(d).

information confidential.  Robinson also testified that as a matter of policy her department never discloses the results—positive or negative—of an employee's drug test.

Regardless of how he found out about the drug test results, Anthony informed Harrison that he had tested positive for barbiturates.  Harrison responded by claiming to have a prescription, which Anthony instructed him to retrieve.  Anthony then called the MRO and passed the phone to Harrison, who answered a series of questions about the medication.  The MRO asked him how long he had been disabled, what medication he took, and how long he had taken it.  He replied that he had epilepsy since he was two years old, he took barbiturates to control it, and he stated the amount of his dosage.  Anthony did not ask any questions, but he remained in the room during this colloquy and heard Harrison's responses to the MRO's questions.

On July 19, 2006, the MRO reported to Williams that Harrison's drug test had been cleared.  By this time, Williams had also received clearance to hire Harrison, information she passed on to Anthony.  However, Anthony told human resources not to prepare an offer letter for Harrison.[2]  Anthony then asked Aerotek

_____

[2] Had the offer letter been sent as per BEHI's usual policy, Harrison would have received it on or near August 2, 2006.

4

not to return Harrison to BEHI.  On August 18, 2006, Aerotek informed Harrison that he would not be returning to BEHI, because he had a performance and attitude problem, and because he had been accused of threatening Anthony.  He was fired from Aerotek that same day.

Through the course of the litigation, Anthony has asserted three reasons to support his decision not to hire Harrison: (1) he was too busy preparing for a company-wide audit to extend the offer; (2)  Harrison had made threats against him;[3] and (3) several employees had expressed concern to him about Harrison's competence.[4]  Anthony maintains that, in light of these concerns, he simply needed more time to evaluate Harrison.  BEHI has also asserted that Anthony lacked the authority to hire Harrison, because corporate had closed all open positions and revoked all previously approved requisitions for employees, including the position for which Harrison applied, on August 10, 2006.  Harrison argues that the

---

[3] According to Anthony, he was told that Harrison threatened to "put his foot up [his] rear if [Anthony] did not ease off of him," and to sue BEHI if he was not hired.  When later questioned about the timing of the alleged threats, Harrison admitted that they were not made until <u>after</u> he had stopped the offer letter.  Anthony testified that the "final straw" was when Harrison refused to repair a "hot" board.  However, Harrison maintains that the "hot" board incident was a misunderstood practical joke, a fact which we accept for purposes of summary judgment.

[4] One employee, Tim Brown, told Anthony that Harrison was incompetent and that he would be making a mistake if he hired him.  Brown shared these concerns with Anthony once he heard Harrison was being considered as a permanent employee, and he testified that he did not know about the drug test.

revocation cannot support Anthony's decision not to hire him, because it came weeks after Anthony told human resources not to prepare the offer letter.

**B.**

On May 3, 2007, Harrison sued BEHI[5] in the United States District Court for the Northern District of Alabama.[6] He alleged various violations of the ADA: namely, that (1) BEHI engaged in an improper medical inquiry, (2) he was not hired due to a perceived disability, and (3) he was terminated due to a perceived disability. BEHI denied these claims and moved for summary judgment, focusing solely on the perceived disability claim. In his response, Harrison maintained that he had made out a prima facie case for an improper medical inquiry and a perceived disability. BEHI replied, arguing that (1) the Eleventh Circuit has not yet recognized a private right of action for the making of an improper medical inquiry; (2) even if it had, Harrison failed to plead it; and (3) regardless, the undisputed material facts established that BEHI was entitled to judgment as a matter of law.

---

[5] Harrison mistakenly named BEHI's parent company, Benchmark Electronics, Inc. ("BEI") in his complaint. After BEI moved to dismiss the case, he filed a motion to substitute BEHI as the defendant, which the district court granted.

[6] Harrison's complaint followed the usual path to judicial review of an ADA claim. On September 26, 2006, Harrison filed a charge with the EEOC alleging various violations of the ADA. The EEOC determined that he did not have a disability, and it did not investigate an improper medical inquiry claim. The EEOC dismissed his claim and gave notice of his right to sue under the ADA on February 7, 2007, from which his federal suit stemmed.

The district court granted BEHI's motion, as to both the pre-employment medical inquiry and perceived disability claims.[7] With regard to the medical inquiry claim, the court "agree[d]" with BEHI that Harrison had failed to plead it. Despite this statement, the court went on to examine the merits of the pre-employment medical inquiry claim. The court first acknowledged that we have never held that a private right of action exists for such claims. Even assuming a private right of action, however, the court held that Harrison could not make out a prima facie case for an improper medical inquiry. Because Harrison "tested positive for barbiturates," the court held that BEHI was then authorized to ask Harrison whether he "had a legitimate use for such medication."

## II.

We review the district court's grant of summary judgment de novo, applying the same legal standards as the district court." Sierra Club, Inc. v. Leavitt, 488 F.3d 904, 911 (11th Cir. 2007). In so doing, we must view all evidence and draw all reasonable inferences in favor of the non-moving party. Galvez v. Bruce, 552 F.3d 1238, 1241 (11th Cir. 2008).

---

[7] Harrison appeals only the portion of the district court's opinion regarding his ADA medical inquiry claim. He does not contest the court's grant of summary judgment to BEHI on the perceived disability claim.

7

## III.

## A.

Before addressing the merits of Harrison's appeal, we must first examine whether he, a non-disabled individual, can state a private cause of action for a prohibited medical inquiry in violation of § 12112(d). We have not yet decided "whether a plaintiff has a private right of action under 42 U.S.C. § 12112(d)(2)." Bennett v. Dominguez, 196 F. App'x 785, 793 (11th Cir. 2006); see also Posey v. Alternative Home Health Care of Lee County, Inc., No. 07-cv-103, 2008 WL 2047935, at *2 (M.D. Fla. May 13, 2008) (noting that while we have not yet "determined whether a private cause of action is available under § 12112(d)(2), . . . other courts have found such actions to be proper"). Harrison urges us to join our sister circuits who are unanimous in recognizing a private cause of action irrespective of the plaintiff's disability status under § 12112(d)(2). See, e.g., Murdock v. Washington, 193 F.3d 510, 512 (7th Cir. 1999); Fredenburg v. Contra Costa County Dep't of Health Servs., 172 F.3d 1176, 1182 (9th Cir. 1999); Griffin v. Steeltek, 160 F.3d 591 (10th Cir. 1998); see also Conroy v. N.Y. State Dep't of Corr. Svcs., 333 F.3d 88, 94-95 (2d Cir. 2003) (stating the same in the context of § 12112(d)(4)); Cossette v. Minn. Power & Light, 188 F.3d 964, 969-70 (8th Cir. 1999) (same).

**1.**

The ADA was enacted "to provide a clear and comprehensive national mandate to end discrimination against individuals with disabilities and to bring persons with disabilities into the economic and social mainstream of American life." H.R. Rep. No. 101-485, pt. 2, at 23 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 304. With regard to employment, the ADA makes it illegal for a "covered entity" to "discriminate against a qualified individual with a disability." § 12112(a). The Act also restricts an employer's ability to make medical examinations or inquiries that relate to an applicant's disability status. See § 12112(d). Subsection 12112(d)(1) states the general bar against using medical examinations or inquiries to discriminate. Subsections (d)(2) through (d)(4) provide further guidance regarding three distinct phases of the application process: (1) pre-offer, see § 12112(d)(2); (2) post-offer but pre-employment, see § 12112(d)(3); and (3) employment, see § 12112(d)(4).

In the pre-offer stage, which is at issue in this case, "a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability." § 12112(d)(2)(A). An employer may only inquire into the "ability of an applicant to perform job-related functions."

9

§ 12112(d)(2)(B) (emphasis added); see 29 C.F.R. § 1630.14(a) (providing that an employer may make "pre-employment inquiries into the ability of an applicant to perform job-related functions, and/or may ask an applicant to describe or to demonstrate how, with or without reasonable accommodation, the applicant will be able to perform job-related functions"). Section 12112(d)(2)'s prohibition is premised on Congress's belief that "[h]istorically, employment application forms and employment interviews requested information concerning an applicant's physical or mental condition." H.R. Rep. No. 101-485, pt. 2, at 72-73. Congress believed that employers were using this information "to exclude applicants with disabilities—particularly those with so-called hidden disabilities such as epilepsy, diabetes, emotional illness, heart disease and cancer—before their ability to perform the job was even evaluated." Id. Thus, subsection (d)(2) "assure[s] that misconceptions do not bias the employment selection process." Id.

**2.**

In interpreting § 12112(d), we are guided by traditional canons of statutory construction. Our "starting point" is the language of the statute itself. United States v. DBB, Inc., 180 F.3d 1277, 1281 (11th Cir. 1999). Moreover,

> [w]e assume that Congress used the words in a statute as they are commonly and ordinarily understood, and we read the statute to give full effect to each of its provisions. United States v. McLymont, 45 F.3d 400,

10

401 (11th Cir. 1995) (per curiam). We do not look at one word or term in isolation, but instead we look to the entire statutory context. United States v. McLemore, 28 F.3d 1160, 1162 (11th Cir. 1994) (citation omitted). We will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if: (1) the statute's language is ambiguous; (2) applying it according to its plain meaning would lead to an absurd result; or (3) there is clear evidence of contrary legislative intent. See Consolid. Bank, N.A. v. Office of Comptroller of Currency, 118 F.3d 1461, 1463-64 (11th Cir. 1997) (citations omitted).

Id. Turning first to the statutory language at issue in this case, the plain language of § 12112(d)(2) does not predicate suit under the statute on an applicant's disability status. In contrast to the ADA's general prohibition of disability discrimination in § 12112(a), which refers only to "qualified individuals with disabilities," § 12112(d)(2) refers broadly to "applicants." An "applicant" is "[a] person who submits a formal application to do something or for a position, especially as part of recruitment or selection process; a candidate." The Oxford English Dictionary (11th ed. 2008). We assume that Congress used this term as it is commonly and ordinarily understood, and in the absence of any limiting language, we do not infer otherwise.

Of course, defining the plain meaning of a statutory word is only our starting point for statutory construction. We must also consider its placement and purpose in the statutory scheme. McLemore, 28 F.3d at 1162. An argument could

11

be made that because § 12112(d)(1) expressly incorporates § 12112(a)'s prohibition of discrimination against "qualified individuals with disabilities," only disabled applicants may sue under subsection (d)(2).  See Adler v. I & M Rail Link, L.L.C., 13 F. Supp. 2d 912, 935 (N.D. Iowa 1998) (holding that the prohibition against pre-employment inquiries specifically refers back to the general prohibition against qualified individuals with disabilities), abrogated by Cossette, 188 F.3d at 964 (reasoning that, "[a]lthough subsection (d)(1) provides that subsection (a)'s general prohibition against discrimination shall include discrimination on the basis of medical examinations and inquiries, that provision is only one of several protections afforded by subsection (d), and it is only discrimination itself (and not illegal disclosure) that requires a showing of disability" (citations omitted)).  We reject the Adler court's reading.  The restrictive language of § 12112(a)—incorporated by reference in § 12112(d)(1)—simply does not extend to subsection (d)(2).  Rather, subsection 12112(d)(1) incorporates § 12112(a)'s general rule that to maintain an action for discrimination itself, a plaintiff must be disabled under the ADA.  Thus, one way a disabled plaintiff could meet his prima facie case of discrimination would be by showing that his employer discriminated against him by requiring a pre-employment medical examination or making a pre-employment improper medical

12

inquiry in violation of subsection (d). In contrast, § 12112(d)(2) sets forth a specific bar against medical examinations and inquiries with respect to <u>any</u> applicant who has not yet received a job offer. In this context, a potential employer is not allowed to conduct any medical examinations, and may only inquire into an applicant's ability to perform "job-related functions." § 12112(d)(2)(B).

Giving effect to the full statute, § 12112(d)(2) does not limit coverage to applicants who are also "qualified individuals with disabilities," and we do not infer such a restriction. In addition, we note that a contrary reading would go against "clear evidence of contrary legislative intent." <u>Consol. Bank</u>, 118 F.3d at 1463-64. In enacting § 12112(d), Congress sought to prevent employers from using pre-employment medical inquiries "to exclude applicants with disabilities—particularly those with so-called hidden disabilities such as epilepsy, diabetes, emotional illness, heart disease, and cancer—before their ability to perform the job was even evaluated." H.R. Rep. No. 101-485, pt. 2, at 1. The legislative history of § 12112(d)(2) indicates that "Congress wished to curtail all questioning that would serve to identify and exclude persons with disabilities from consideration for employment by drafting [§ 12112(d)]." <u>Griffin</u>, 160 F.3d at 594. Allowing non-disabled applicants to sue will enhance and enforce Congress's

prohibition. Moreover, a contrary reading would vitiate § 12112(d)(2)'s effectiveness: "It makes little sense to require an [applicant] to demonstrate that he has a disability to prevent his [potential] employer from inquiring as to whether or not he has [one]." Griffin, 160 F.3d at 594 (internal quotation and citation omitted). When viewed in its full statutory context, and consistent with our sister circuits' holdings, subsection (d)(2) does not require a showing of disability. See Fredenburg, 172 F.3d at 1182; see also Griffin, 160 F.3d at 594.

Finally, although administrative interpretations of an Act by its enforcing agency are not controlling, they "do constitute a body of experience and informed judgment to which [we] . . . may properly resort for guidance." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 106 S. Ct. 2399, 2403, 91 L. Ed.2d 49 (1986); see EEOC, Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act (EEOC Notice 915.002) (EEOC, July 27, 2000), available at http://www.eeoc.gov/policy/docs/guidance-inquiries.html ("This statutory language makes clear that the ADA's restrictions on inquiries and examinations apply to all employees, not just those with disabilities."). Thus, we now explicitly recognize that a plaintiff has a private right of action under 42 U.S.C. § 12112(d)(2), irrespective of his disability status.

**B.**

The district court concluded that Harrison failed to plead his medical inquiry claim in his complaint, a determination Harrison contests on appeal. We only require that a plaintiff provide "a short and plain statement of the claim showing that [he] is entitled to relief." Fed. R. Civ. P. 8(a)(2). "The point is to 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" Davis v. Coca-Cola Bottling Co. Consol., 516 F.3d 955, 974 (11th Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed.2d 929 (2007)). A complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Davis, 516 F.3d at 974 (internal quotation and citation omitted); see Twombly, 550 U.S. at 555, 127 S. Ct. at 1964-65; Ashcroft v. Iqbal, __ U.S. __, __-__, 129 S. Ct. 1937, 1949-50, 173 L. Ed. 2d 868 (2009) (noting that Rule 8 requires "more than unadorned, the-defendant-unlawfully-harmed-me accusation"); see also Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir. 2009) (citing Iqbal, __ U.S. at __-__, 129 S. Ct. at 1949-50), for the same proposition).

Harrison satisfied our liberal pleading standard. His complaint alleged that BEHI questioned him about his seizures following a pre-employment drug test, and he claimed damages for these allegedly prohibited medical inquiries. Thus,

15

BEHI had fair notice that Harrison sought relief under § 12112(d)(2), and his allegations, which specifically referred to pre-employment medical inquiries, were more than speculative.[8] To the extent that the district court concluded otherwise, it erred.

## C.

Finally, Harrison objects to the district court's holding that he failed to make out a prima facie case for a prohibited medical inquiry under § 12112(d)(2)(A). The district court reasoned that because the questions posed to Harrison were permissible questions following a test for illegal drug use, he failed to state a claim under the statute.

## 1.

Section 12112(d)(2) prohibits medical examinations and certain medical inquiries at the pre-offer stage. Consistent with Congress's intent, the regulations

---

[8] In Grimsley v. Marshalls of MA, Inc., 284 F. App'x 604 (11th Cir. 2008), we held that a plaintiff's claim failed to state a claim for relief under § 12112(d) when his only reference to an improper medical inquiry was as part of a laundry list of facts that supported his hostile work environment claim. Id. at 610. Grimsley is inapposite, since Harrison stated facts tending to support an improper medical inquiry claim and referred specifically to the cause of action.

BEHI also asserts that Harrison's counsel conceded the improper medical inquiry claim during the plaintiff's deposition, and that he failed to exhaust his administrative remedies. Because BEHI did not present these issues to the district court, we will not consider them on appeal. BUC Int'l Corp. v. Int'l Yacht Council Ltd., 489 F.3d 1129, 1140 (11th Cir. 2007).

adopted under the ADA by the EEOC[9] provide that an employer may make

"pre-employment inquiries into the ability of an applicant to perform job-related

functions, and/or may ask an applicant to describe or to demonstrate how, with or

without reasonable accommodation, the applicant will be able to perform the job

related functions." 29 C.F.R. § 1630.14(a); see also 56 Fed. Reg. 35725, 35732

(1991).  The regulations clarify that while it is appropriate for an employer to

inquire into an applicant's ability to perform  job-related functions, it is illegal for

him to make targeted disability-related inquiries.  See 29 C.F.R. § 1630.13 ("[I]t is

unlawful for a covered entity to conduct a medical examination of an applicant or

to make inquiries as to whether an applicant is an individual with a disability or as

to the nature or severity of such disability.").  The EEOC has defined "disability-

related" questions as those "likely to elicit information about a disability."  EEOC,

ADA Enforcement Guidance: Preemployment Disability-Related Questions and

Medical Examinations (EEOC Notice 915-002) (Oct. 10, 1995), available at

http://www.eeoc.gov/policy/docs/medfin5.pdf [hereinafter Enforcement

Guidance]; see Grenier v. Cyanamid Plastics, Inc., 70 F.3d 674, 677 (1st Cir.

1995) (recognizing the "likely to elicit" standard).  On the other hand, "if there are

many possible answers to a question and only some of those answers would

_____

[9] The EEOC's regulations are entitled to substantial judicial deference.  See Albra v.
Advan, Inc., 490 F.3d 826 F.3d 826, 833 n.6 (11th Cir. 2007).

contain disability-related information, the question is not 'disability-related.'" Enforcement Guidance.

In addition to allowing inquiries directed at an applicant's ability to perform job-related functions, the ADA recognizes an exemption for drug tests. See § 12114 ("For purposes of this subchapter, a test to determine the illegal use of drugs shall not be considered a medical examination."). Employers may also ask follow-up questions in response to a positive drug test, see 29 C.F.R. § 1630.3(a), as correctly noted by the district court. See Enforcement Guidance ("[I]f an applicant tests positive for illegal drug use . . . the employer may validate the test results by asking about lawful drug use or possible explanations for the positive result other than the illegal use of drugs. [For example,] the employer may lawfully ask questions such as, 'What medications have you taken that might have resulted in this positive test result? Are you taking this medication under a lawful prescription?'"). However, the regulations, coupled with the EEOC's guidelines,[10] make clear that disability-related questions are still prohibited. See Enforcement Guidance ("Employers should know that many questions about current or prior lawful drug use are likely to elicit information about a disability, and are therefore

---

[10] As an administrative interpretation, the Guidelines are "a body of experience and informed judgment to which [we] may properly resort for guidance." Meritor, 477 U.S. at 65, 106 S. Ct. at 2403 (internal quotation and citation omitted).

18

impermissible at the pre-offer stage.") As the legislative history of § 12112(d)(2) makes clear, the drug-test exemption "should not conflict with the right of individuals who take drugs under medical supervision not to disclose their medical condition before a conditional offer of employment has been given." H.R. Rep. 101-485, pt. 2, at 79.

While the district court correctly concluded that employers may conduct follow-up questioning in response to a positive drug test, it failed to acknowledge any limits on this type of questioning. Since the district court did not recognize that § 12112(d)(2) prohibits disability-related inquiries, it found that the facts supported summary judgment. Harrison testified that Anthony told him his drug test was positive, that he disclosed his prescription,[11] that he was then taken to Anthony's office where he answered questions about his medication, and that Anthony remained in the room during this interview. Anthony denied ever knowing that Harrison suffered from epilepsy, and he acknowledged that it would be improper for him to be present during the MRO interview. Although BEHI was permitted to ask follow-up questions to ensure that Harrison's positive drug test

---

[11] Harrison's disclosure that he had a legal prescription for the medication is not a voluntary disclosure concerning his disability. Harrison maintains that he only disclosed the fact of his prescription, and we must accept his view of the facts on summary judgment. Cf. Bennett, 196 F. App'x 785, where the plaintiff disclosed the fact of his disability "in order to gain an advantage in the application process." Id. at 790.

was due to a lawful prescription, a jury may find that these questions exceeded the scope of the likely-to-elicit standard, and that Anthony's presence in the room violated the ADA, especially considering the conflict between Harrison's testimony—that to answer the MRO's questions he was forced to disclose the fact and extent of his epilepsy—and Anthony's—that he never knew Harrison suffered from the condition. A reasonable jury could infer that Anthony's presence in the room was an intentional attempt likely to elicit information about a disability in violation of the ADA's prohibition against pre-employment medical inquiries. On summary judgment we must give Harrison the benefit of that inference.

**2.**

Finally, BEHI obliquely argues that even assuming an improper medical inquiry, Harrison cannot present evidence of damages sufficient to overcome summary judgment. Normally, as part of his prima facie case of discrimination under the ADA, a plaintiff must show that he is a qualified individual with a disability. Since we have held that such a requirement is not a prerequisite to suit under § 12112(d)(2), such a showing cannot be required. However, our sister circuits require that a non-disabled plaintiff at least show some damages[12]

---

[12] While some of our sister courts use the terms "injury-in-fact," we think "damages" is more appropriate when discussing the plaintiff's prima facie case. See, e.g., Tice, 247 F.3d at 519 (using the term "injury-in-fact"); Griffin, 160 F.3d at 595 (concluding that the plaintiff had "sufficiently alleged that he suffered an injury in fact").

(emotional, pecuniary, or otherwise) caused by a § 12112(d) violation. See, e.g., Tice v. Centre Area Transp. Auth., 247 F.3d 506, 519-20 (3d Cir. 2001); Armstrong v. Turner Indus., Inc., 141 F.3d 554, 562-63 (5th Cir. 1998); O'Neal v. City of New Albany, 293 F.3d 998, 1007 (7th Cir. 2002); Cossette v. Minn. Power & Light, 188 F.3d 964, 971 (8th Cir. 1999); Griffin v. Steeltek, 160 F.3d 591, 595 (10th Cir. 1998). We agree. In Griffin, 160 F.3d at 595, the Tenth Circuit reversed the district court's grant of summary judgment in an improper medical inquiry case. The court concluded that the plaintiff had "sufficiently alleged that he suffered [damages], specifically that [his potential employer] did not hire [him] because of his responses to the impermissible questions, and . . . his suit can go forward." Id. Similarly, Harrison has presented sufficient evidence for a reasonable jury to find that he suffered damages—namely, that he was not hired as a permanent employee of BEHI because of his responses to allegedly unlawful questions. By way of example, we note Anthony's contradictory testimony: in his affidavit he claimed that he was too busy to hire Harrison due to the company-wide audit, and he maintained that his decision was not "in any way" based on Harrison's epilepsy; however, in his deposition, he acknowledged that the audit alone was not a reason to stop the offer letter. Coupled with the dispute over the role the corporate revocation of the requisitions played in Anthony's decision, a

21

reasonable jury could infer that Anthony did base his decision not to hire Harrison on information gleaned from an improper medical inquiry. As our sister circuit noted in <u>Griffin</u>, "[i]t may be that, at trial [BEHI] will be able convincingly to show that its proffered reason[s] [were] bona fide. In that case it will prevail." <u>See</u> <u>Griffin</u>, 160 F.3d at 595 n.5. We merely hold that summary judgment cannot be supported at this time; we must, therefore, reverse and remand.

REVERSED AND REMANDED.